**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | |
|---|---|
| JOSE VELASQUEZ, ) | No. ED CV 10-1239-PLA |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM OPINION AND ORDER** |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on August 26, 2010, seeking review of the Commissioner's denial of his application for Disability Insurance Benefits. The parties filed Consents to proceed before the undersigned Magistrate Judge on September 14, 2010. Pursuant to the Court's Order, the parties filed a Joint Stipulation on May 5, 2011, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

# II.

# BACKGROUND

Plaintiff was born on May 10, 1981. [Administrative Record ("AR") at 34, 74.] He has a high school education, some college training [AR at 34, 45, 158], and has past work experience as, among other things, a custodian, a warehouseman, a laundry sorter, and an education assistant. [AR at 131-38, 143-48, 154-56, 161-68.]

On January 7, 2008, plaintiff filed his application for Disability Insurance Benefits, alleging that he has been disabled since December 1, 2006, due to depression and hallucinations. [AR at 74, 117-21, 139, 153-60.] After his application was denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [AR at 76-85, 88-89.] A hearing was held on January 13, 2010, at which time plaintiff appeared with counsel and testified on his own behalf. A vocational expert also testified. [AR at 28-73.] On March 25, 2010, the ALJ determined that plaintiff was not disabled. [AR at 8-24.] Plaintiff requested review of the hearing decision. [AR at 6.] When the Appeals Council denied plaintiff's request for review on June 28, 2010, the ALJ's decision became the final decision of the Commissioner. [AR at 1-5.] This action followed.

# III.

# STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257. When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well

as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner. Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

**IV.**

**THE EVALUATION OF DISABILITY**

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

**A.    THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled

1 and the claim is denied. Id. The claimant has the burden of proving that he is unable to perform
2 past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie
3 case of disability is established. The Commissioner then bears the burden of establishing that
4 the claimant is not disabled, because he can perform other substantial gainful work available in
5 the national economy. The determination of this issue comprises the fifth and final step in the
6 sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966
7 F.2d at 1257.

**B.   THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

In this case, at step one, the ALJ found that plaintiff had not engaged in any substantial gainful activity since the alleged onset date of the disability.[1] [AR at 13.] At step two, the ALJ concluded that plaintiff has the severe impairment of "a depressive disorder with psychotic features." [Id.] At step three, the ALJ determined that plaintiff's impairments do not meet or equal any of the impairments in the Listing. [AR at 16.] The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[2] to perform a full range of work at all exertional levels but with the following non-exertional limitations: "[plaintiff] is limited to the performance of simple routine work and he can have no public contact as a function of his job duties." [AR at 17.] At step four, the ALJ concluded that plaintiff is capable of performing his "past relevant work as a laborer stores and a laundry sorter."[3] [AR at 22.] In the alternative, the ALJ determined at step five that considering plaintiff's age, education, work experience, and residual functional capacity, there are

---

[1]   The ALJ also determined that plaintiff is insured for Disability Insurance Benefits purposes through December 1, 2010. [AR at 13.]

[2]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations. Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

[3]   The ALJ further indicated that plaintiff's past relevant work as a laborer stores and laundry sorter "does not require the performance of work-related activities precluded by his residual functional capacity." [AR at 22.]

jobs that exist in significant numbers in the national economy that plaintiff can perform.[4]  [AR at 23.]  Accordingly, the ALJ found plaintiff not disabled. [AR at 24.]

## V.

## **THE ALJ'S DECISION**

Plaintiff contends that the ALJ did not: (1) properly consider the opinion of treating physician Dr. Marissa Mejia; and (2) properly consider and accurately assess plaintiff's residual functional capacity.  [Joint Stipulation ("JS") at 2.]  As set forth below, the Court respectfully disagrees with plaintiff and affirms the ALJ's decision.

**A.    TREATING PHYSICIAN'S OPINION**

Plaintiff contends that the ALJ erred in rejecting the opinion of plaintiff's treating physician, Dr. Mejia.  Specifically, plaintiff argues that the "ALJ erred in failing to recontact Dr. Mejia and in not doing so failed to provide specific and legitimate reasons, supported by substantial evidence, for rejecting the doctor's opinion."  [JS at 6.]  Plaintiff further asserts that the ALJ improperly rejected Dr. Mejia's opinion because it was in the form of a "check off report."  [Id.]  The Court disagrees.

In evaluating medical opinions, the case law and regulations distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).  See 20 C.F.R. §§ 404.1502, 404.1527, 416.902, 416.927; see also Lester, 81 F.3d at 830.  Generally, the opinions of treating physicians are given greater weight than those of other physicians, because treating physicians are employed

---

[4]  Although the ALJ found plaintiff not disabled at step four of the sequential evaluation process, and thus was not required to proceed to the fifth step of the evaluation process, the ALJ did so because plaintiff's past relevant work was performed at various temporary employment agencies for short periods of time and thus may not have been performed at the substantial gainful activity level. Therefore, the ALJ made alternative findings at step five of the sequential evaluation process.  [AR at 23.]

5

to cure and therefore have a greater opportunity to know and observe the claimant. Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007); Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996). Despite the presumption of special weight afforded to treating physicians' opinions, an ALJ is not bound to accept the opinion of a treating physician. However, the ALJ may only give less weight to a treating physician's opinion that conflicts with the medical evidence if the ALJ provides explicit and legitimate reasons for discounting the opinion. See Lester, 81 F.3d at 830-31 (the opinion of a treating doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record); see also Orn, 495 F.3d at 632-33 ("Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is 'still entitled to deference.'") (citations omitted); Social Security Ruling[5] 96-2p (a finding that a treating physician's opinion is not entitled to controlling weight does not mean that the opinion is rejected).

In February 2007, plaintiff entered the San Bernardino Behavioral Health Facility complaining of anxiety, racing thoughts, poor sleep, depression, and auditory hallucinations. [AR at 236-41.] Plaintiff's behavior was somewhat guarded, he seemed anxious and distracted, and had poor eye contact. [AR at 239.] He demonstrated difficulty in concentrating and focusing, and his thought processes and content indicated a poverty of ideas, paranoia, and delusions of reference. [Id.] Dr. Mejia, from the San Bernardino Behavioral Health Facility, treated plaintiff from February 2007 to at least January 2010. [AR at 241-49, 269-71, 275-317.] During that time period, plaintiff also received mental health treatment from social workers at the San Bernardino Behavioral Health Facility. [See, e.g., AR at 285-88, 301-02, 307.] On April 23, 2007, Dr. Mejia diagnosed plaintiff with major depressive disorder, single episode, severe with psychotic features. [AR at 242-43.] On the day of that diagnosis plaintiff's appearance, behavior, speech, thought content and thought processes were within normal limits. [Id.] While his insight and judgment were

---

[5] Social Security Rulings ("SSR") do not have the force of law. Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

6

deemed fair, his mood was depressed,[6] and he complained of auditory hallucinations. [Id.] Plaintiff also reported that he was working. [Id.] Dr. Mejia began treating plaintiff with a variety of psychiatric medications including, among other things, Zyprexa, Lexapro, Abilify, Prozac, Risperdal, Depakote, Geodon, Cymbalta, Seroquel, and Stelazine. [AR at 233-35, 278, 293.] Plaintiff's medications were adjusted throughout the course of his treatment. [AR at 233-35, 243, 245, 247-49, 278, 281, 284, 293, 300, 303, 305, 310.]

In subsequent visits, in July and October 2007, plaintiff again complained of auditory hallucinations and depression. [AR at 245-46.] In January 2008, plaintiff's symptoms became more aggravated after he was fired from his job. [AR at 248.] Dr. Mejia's treatment notes indicate that plaintiff experienced increased anger, auditory hallucinations, and suicidal and homicidal ideations; however, plaintiff declined Dr. Mejia's offer of hospitalization. [Id.] By the end of the month, plaintiff's condition improved, he was less depressed, and had no more feelings of anger or suicidal or homicidal ideations. [AR at 249.] In February 2008, plaintiff told Dr. Mejia that his sleep, appetite, and concentration had improved; furthermore, he reported being less depressed when he was occupied and earning money at his temporary jobs. [AR at 271.] In June 2008, although plaintiff still experienced anxiety around people, he reported hearing voices less often and had improved sleep and appetite. The treatment notes indicate that he was also helping his father with various odd jobs and occasional warehouse work. [AR at 279.] In July 2008, plaintiff was depressed because he stopped working and was stressed out about money; however, Dr. Mejia noted that he experienced fewer auditory hallucinations and less paranoia. [AR at 278.] In October 2008, Dr. Mejia's treatment notes state that plaintiff stopped taking his medications because his friends told him they are addictive and that he does not have a mental illness. Plaintiff still complained of insomnia and occasional auditory hallucinations, but he had less paranoia and was working full time as a general laborer. [AR at 312.] In February 2009, Dr. Mejia

---

[6] Plaintiff stated that he became depressed in February 2007 after the death of his grandmother even though he was not particularly close to her. Plaintiff began experiencing trouble sleeping, could no longer concentrate, and had diminished interest in his usual activities. Plaintiff also revealed to Dr. Mejia that he had been unhappy with his previous job as a teaching assistant for severely handicapped children and finally decided to quit in February 2007. [AR at 242.]

reported that plaintiff would not require hospitalization in the next six to twelve months and would be able to take care of himself by doing activities of daily living and attending doctor's appointments regularly.[7] [AR at 292.] In April 2009, plaintiff appeared happy and stated that he no longer remembered the last time he heard voices; moreover, plaintiff reported he was helping his father mow lawns, was attending adult school, and was not bothered by the voices when he kept busy. [AR at 304.] However, in May 2009, plaintiff was laid off from his job and complained of increased auditory hallucinations, poor sleep, and poor appetite. [AR at 303.] By July 2009, plaintiff's condition improved with a decrease in auditory hallucinations and paranoia along with better appetite and concentration. [AR at 298.] In August 2009, plaintiff reported that he experienced fewer auditory hallucinations, no longer felt paranoid, and liked his medications. [AR at 297.] By October 2009, plaintiff was feeling better and no longer experienced paranoia. [AR at 295.] In December 2009, Dr. Mejia's treatment notes indicate that plaintiff was feeling better even though he became restless when not working. [AR at 294.]

On January 27, 2010, Dr. Mejia completed a Work Capacity Evaluation (Mental)[8] form, in which she checked boxes indicating that plaintiff had moderate to extreme limitations in all areas

---

[7] Dr. Mejia's report is dated February 2009. [AR at 292.] Both the ALJ and the Joint Stipulation erroneously state that Dr. Mejia's report is from February 2010. [AR at 18; JS at 4.]

[8] The Evaluation form provided the following six ratings for each of the work activities listed on the form: 1) "None: Absent or minimal limitation. If limitations are present they are transient and/or expectable reactions to psychological stressors;" 2) "Slight: Some mild limitation in this area, but generally functions pretty well;" 3) "Moderate: more than slight but less than marked;" 4) "Marked: Serious limitations in this area. The ability to function in this area is severely limited but not precluded;" 5) "Extreme: Severe limitations in this area. No useful ability to function in this area;" and 6) "Unknown: Unable to assess limitations based on examination or review of medical records." [AR at 315.]
Dr. Mejia opined that plaintiff was markedly limited in his abilities to remember locations and work-like procedures; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. Dr. Mejia opined that plaintiff was extremely limited in his abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; accept instructions and respond appropriately to criticism from supervisors; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others. [AR at 315-16.]

8

of functioning, his impairments have lasted or would be expected to last at least twelve months, and his symptoms would cause him to be absent from work three or more days per month. [AR at 315-16.] In the decision, the ALJ provided multiple reasons for rejecting Dr. Mejia's opinion expressed in the January 27, 2010 check-off report, including: it was brief and conclusory, it was not supported by her own treatment records, and it was more extreme than plaintiff's own testimony regarding his limitations and functional ability. [AR at 18-19.] As discussed below, these were specific and legitimate reasons to reject Dr. Mejia's opinion.

An ALJ is entitled to reject a "treating physician's opinion that is conclusory and brief and unsupported by clinical findings" as well as a "check-off report[] that [does] not contain any explanation of the bases of [its] conclusions." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). Furthermore, an ALJ is not required to accept a medical opinion that is inadequately supported by medical findings. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) (an ALJ may discount treating physicians' opinions that are conclusory, brief, unsupported by the record as a whole or by objective medical findings); Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ properly rejected doctors' opinions because they were contained in check-off reports that did not contain any explanation of the bases for the conclusions); Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992) (ALJ may reject the conclusory opinion of a treating physician if the opinion is unsupported by clinical findings); Murray v. Heckler, 722 F.2d 499, 501 (9th Cir. 1983) (expressing preference for individualized medical opinions over check-off reports). Here, the ALJ did not err in finding that Dr. Mejia's opinion was brief and conclusory. Her opinion, expressed in the Work Capacity Evaluation (Mental) form, was indeed brief and conclusory in that it lacked clinical findings to support its conclusion, it failed to express either objective findings or specific clinical observations, and it was in the form of a check-off report without any explanation for the bases of its conclusions. [AR at 18.]

Next, an ALJ may also properly reject a treating physician's opinion that is inconsistent with the physician's treatment notes. See 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4) (the more consistent an opinion is with the record as a whole, the more weight it will be given); see also Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 602-03 (9th Cir. 1999) (a medical report's

inconsistency with the overall record constitutes a legitimate reason for discounting the opinion); Matney, 981 F.2d at 1020 (inconsistencies in a physician's opinion represent a specific and legitimate reason for rejecting it); Weetman v. Sullivan, 877 F.2d 20, 23 (9th Cir. 1989) (a physician's opinion may be rejected where it is inconsistent with the physician's own treatment notes).

Here, the ALJ did not err in concluding that Dr. Mejia's assessment in the Work Capacity Evaluation (Mental) form was inconsistent with her own treatment records. In the form she states that plaintiff has marked to extreme limitations in most areas of functioning. [AR at 315-16.] Her treatment notes, however, indicate that she knew plaintiff was attending school, had part-time jobs, and volunteered to help his father with physical activities like mowing lawns and gardening. [AR at 242, 271, 279, 304.] Specifically, in the form, Dr. Mejia checked the box stating plaintiff is extremely limited (meaning he has a severe limitation or no useful ability to function in this area) in his ability to be aware of normal hazards and take appropriate precautions. [AR at 316.] In her treatment notes, however, Dr. Mejia noted that plaintiff helps his father mow lawns. [AR at 304.] Dr. Mejia's knowledge of plaintiff's ability to operate hazardous equipment such as a lawnmower is inconsistent with her conclusion that plaintiff is severely limited and has no useful ability to recognize normal hazards and take appropriate precautions. [AR at 304, 316.]

Dr. Mejia also checked the box on the form indicating that plaintiff is extremely limited (meaning he has a severe limitation or no useful ability to function in this area) in his ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, set realistic goals, or make plans independently of others. [AR at 315-16.] Her treatment notes, however, indicate that plaintiff enjoyed attending school and also held various temporary jobs. [AR at 242, 246, 271, 279, 312.] Plaintiff's ability to go to work and school seems to contravene Dr. Mejia's assessment that he has no useful ability to perform activities within a regular schedule, maintain regular attendance, or be punctual within customary tolerances. Furthermore, the notes made by a social worker at the San Bernardino Behavioral Health Facility indicate that plaintiff was working toward his goal to "complete [c]ollege, [and] be able to enjoy fun activities, and work" and that plaintiff "participated well in the discussion and seems enthusiastic

to practice techniques learned." [AR at 285-86.] These treatment observations by the social worker also contradict Dr. Mejia's assessment that plaintiff is extremely limited in his ability to set realistic goals or make plans independently of others. [AR at 315-16.] Also, the number of medical appointments that plaintiff attended from February 2007 through January 2010, with both Dr. Mejia and the social workers at the San Bernardino Behavioral Health Facility, undermine Dr. Mejia's opinion that plaintiff is severely limited in his ability to maintain regular attendance and be punctual within customary tolerances. [AR at 241-49, 270-71, 278-79, 281-82, 284-90, 294-95, 297-98, 300, 303-05, 309-10, 312.] Indeed, Dr. Mejia noted in a February 2009 treatment record that plaintiff would not require any hospitalization in the next six to twelve months and could take care of himself by doing activities of daily living and attending doctors' appointments regularly. [AR at 292.] She then proceeded to write in the same document that plaintiff is unable to work or remain working. [Id.] Dr. Mejia's notation that plaintiff could attend doctors' appointments regularly contradicts her opinion in the check-off report that plaintiff is extremely limited and has no useful ability to perform activities within a schedule and maintain regular attendance. [AR at 315-16.] Furthermore, although plaintiff still experienced occasional depression and anxiety, some of Dr. Mejia's treatment records from April through August 2009 indicate that on several occasions plaintiff reported he was much improved, liked his medications, no longer heard voices, and "appear[ed] happy." [AR at 295, 297, 304.] That stands in contrast to her February 2009 assessment that plaintiff has "severe" depressed mood and is unable to work or remain working. [AR at 292.]

In addition, plaintiff's ability to work, even at part-time temporary jobs, appears inconsistent with both Dr. Mejia's assessment that he is "unable to work or remain working," and with the various marked to extreme limitations noted by her in the check-off report. [AR at 292, 315-16.] Specifically, the fact that plaintiff was actually working at numerous temporary jobs and volunteering throughout the course of his treatment directly undermines Dr. Mejia's assessment that he is "unable to work." [AR at 292.] Furthermore, Dr. Mejia checked boxes indicating that plaintiff was markedly limited (meaning he has serious and severe limitations in functioning) in his abilities to remember locations and work-like procedures, maintain attention and concentration for

extended periods, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. [AR at 315-16.] Her treatment notes, however, indicate that plaintiff worked several temporary jobs, both part-time and full-time, including warehouse work, general labor, assisting children with disabilities, and volunteering to help his father with odd jobs. [AR at 242, 271, 279, 295, 312.] Moreover, the medical notes authored by the San Bernardino Behavioral Health Facility social worker indicate that plaintiff is "high function[ing]" in his ability to work, volunteer, socialize, and attend classes. [AR at 285-87.] Specifically, in August 2008, the notes indicate that plaintiff volunteered at least four hours or more per week helping his father clean yards; however, by September 2008 plaintiff increased his volunteering time to eight or more hours per week with his father in addition to taking on a new volunteer job at a car auction parking cars. [AR at 285-86.] Plaintiff's ability to engage in this type of employment and volunteer work, and his increase in the number of hours worked from month to month, indicates his positive progress and contradicts Dr. Mejia's opinion that he is severely limited in his abilities to remember locations and work like procedures, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, and make simple work-related decisions. In light of the number and type of inconsistencies discussed above, Dr. Mejia's opinion expressed in the Work Capacity Evaluation form is not supported by her own treatment records, and the ALJ provided a specific and legitimate reason for rejecting it.

Next, an ALJ may also properly reject a treating physician's opinion that is inconsistent with the record as a whole. See 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4) (the more consistent an opinion is with the record as a whole, the more weight it will be given); see also Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 602-03 (9th Cir. 1999) (a medical report's inconsistency with the overall record constitutes a legitimate reason for discounting the opinion); see also, e.g., Arnold v. Astrue, 2011 WL 2261058, at *7 (C.D. Cal. June 8, 2011) (an ALJ is entitled to reject a treating doctor's opinion that is not supported by a "plaintiff's statements or [by] the record as a

12

whole"). Specifically, a treating doctor's opinion that describes plaintiff's limitations as more extreme than what plaintiff himself claims is a specific and legitimate reason for the ALJ to reject that treating doctor's opinion. See Coley v. Astrue, 2010 WL 3220300, at *14 (D. Or. Aug. 12, 2010) (ALJ provided a specific and legitimate reason for rejecting physician's opinion because plaintiff's reported activities were inconsistent with the marked limitations set forth in the physician's report) (citing Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001)); Flesher v. Astrue, 2011 WL 2144622, at *4 (D. Ariz. June 1, 2011) (ALJ may properly reject treating physician's assessment of plaintiff's limitations if the assessment is inconsistent with plaintiff's daily activities).

Here, the ALJ properly rejected Dr. Mejia's opinion on the basis that her assessment of plaintiff's functional limitations in the Work Capacity Evaluation form is inconsistent with the record as a whole because it is more extreme than what plaintiff himself claims in his own testimony. Dr. Mejia checked the box indicating that plaintiff is markedly limited in his abilities to maintain attention and concentration for extended periods, to remember locations and work-like procedures, to make simple work-related decisions, to respond appropriately to changes in the work setting, and to work in coordination with or in proximity to others without being distracted by them. [AR at 315-16.] Plaintiff, on the other hand, testified that he continued working at various temporary jobs even after his alleged onset date of disability. [AR at 35.] His jobs included warehouse work where he loaded and unloaded trucks and pulled orders with a pallet jack and forklift. [AR at 36-37.] Plaintiff's testimony about his own ability to work with heavy machinery contradicts Dr. Mejia's assessment that he is markedly limited in his ability to maintain attention and concentration for extended periods, to remember locations and work-like procedures, and to make simple work-related decisions. Furthermore, plaintiff testified that he got along with his co-workers and supervisors at the warehouse job and mostly stayed to himself. [AR at 53.] That testimony contravenes Dr. Mejia's extreme opinion that plaintiff is markedly limited in his ability to work in coordination with or in proximity to others without being distracted by them. [AR at 315-16.] Also, the fact that plaintiff was able to change temporary jobs and adapt to each new work environment

undermines Dr. Mejia's opinion that plaintiff is markedly limited in his ability to respond appropriately to changes in the work setting. [AR at 33, 35-38.]

Dr. Mejia also noted that plaintiff is extremely limited in his ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, set realistic goals, or make plans independently of others. [AR at 315-16.] Plaintiff, on the other hand, testified that he attends school on a part time basis, does algebra homework every night, and is doing "pretty good" in it. [AR at 45-46.] His ability to attend classes regularly and do his homework on schedule contradicts Dr. Mejia's assessment that he is extremely limited and has no useful ability to perform activities within a schedule and maintain regular attendance. Plaintiff further testified that he hopes to someday study computer information technology, his attitude toward school is improving, and that this time he is "sticking with it." [AR at 45.] Plaintiff's positive statements about his goals for the future undermine Dr. Mejia's opinion that he has no useful ability to set realistic goals or make plans independently of others. Plaintiff also testified that he does his own daily grocery shopping, drives a car, plays basketball, and reads books about fitness and psychology. [AR at 46-51, 57.] His ability to carry on these activities contradicts Dr. Mejia's assessment that he is markedly limited in his ability to concentrate or sustain an ordinary routine without special supervision. [AR at 315-16.]

Dr. Mejia further noted that plaintiff is markedly limited in his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. [AR at 315-16.] Plaintiff, on the other hand, testified that he played basketball with his friends, smiled at people in general, felt comfortable in crowded places like fairs and grocery stores, and got along "pretty good" with people in general. [AR at 50-52.] His ability to socialize with his friends through sports and to maintain socially appropriate behavior with strangers in public undermines Dr. Mejia's assessment that he is severely limited in his ability to get along with others without exhibiting behavioral extremes.

Dr. Mejia also checked the box indicating that plaintiff is extremely limited in his ability to be aware of normal hazards and to take appropriate precautions. [AR at 316.] Plaintiff, however, testified that he helped his father mow lawns, did occasional warehouse work involving the use

14

of forklifts, and had a previous long-term job as an education assistant for severely handicapped older children.[9] [AR at 36-37, 53.] Operating hazardous machinery and taking care of disabled children are activities that are well beyond the limits imposed by Dr. Mejia. Accordingly, the extreme and marked limitations expressed in Dr. Mejia's check-off report are not consistent with the types of activities that plaintiff himself claims he can perform.

Finally, plaintiff argues that the ALJ's rejection of Dr. Mejia's opinion is improper because the ALJ failed to "conduct an appropriate inquiry by not recontacting Dr. Mejia [to obtain further clarification] regarding" the basis of her opinion. [JS at 6, 12.] "In Social Security cases, the ALJ has a special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel." Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001). The ALJ's duty to develop the record further is triggered by "[a]mbiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence." Tonapetyan, 242 F.3d at 1150. Here, however, the ALJ did not find that there was ambiguous evidence or that the record was insufficient to allow for proper evaluation of Dr. Mejia's opinion. Instead, the ALJ provided specific and legitimate reasons that were supported by substantial evidence to discount Dr. Mejia's opinion. [AR at 18-19.] Accordingly, the ALJ was not required to re-contact Dr. Mejia in order to develop the record further.

**B. RFC DETERMINATION**

The ALJ determined that plaintiff retained the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: "[plaintiff] is limited to the performance of simple routine work and he can have no public contact as a function of his job duties." [AR at 17.] Plaintiff argues that this RFC determination is inaccurate because the ALJ's assessment "neither takes into account the marked and extreme limitations opined by Dr. Mejia in the Work Capacity Evaluation (Mental) form nor the doctor's opinion that [p]laintiff's impairments

---

[9] Plaintiff testified that he quit his job with handicapped children because he no longer wanted to perform personal hygiene duties such as changing diapers, which is something he had been doing. [AR at 67-69.]

would cause him to be absent from work three days or more every month." [JS at 2, 12 (emphasis omitted).] In determining plaintiff's disability status, the ALJ has a responsibility to determine plaintiff's RFC after considering "all of the relevant medical and other evidence" in the record, including all medical opinion evidence. 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c), 416.945(a)(3), 416.946(c); see SSR 96-8p, 1996 WL 374184, at *5, *7. Since the ALJ provided specific and legitimate reasons supported by substantial evidence for rejecting Dr. Mejia's opinion, the ALJ was not required to incorporate her assessment into the RFC determination. See Wildman v. Astrue, 302 Fed.Appx. 744, 748 (9th Cir. 2008) (where the ALJ properly rejects opinion evidence concerning an alleged impairment, the ALJ may properly exclude the rejected impairment from the RFC determination) (citable for its persuasive value pursuant to Ninth Circuit Rule 36-3).

## VI.
## CONCLUSION

**IT IS HEREBY ORDERED** that: 1. plaintiff's request for reversal, or in the alternative, remand, is **denied**; and 2. the decision of the Commissioner is **affirmed**.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: July 5, 2011

*/s/ Paul L. Abrams*
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE